AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California



FILED

AUG 2 1 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )           Case No.
LG K-30 Cell Phone )
Model Number: LM-X410 MK )           **19MJ3540**
IMEI: 355380096442147 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952, 960, and 963 | Importation of controlled substances and conspiracy |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Jeffrey Rabine, SA, Dept. of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __8/21/19__

_____
Judge's signature

City and state: San Diego, CA         Hon. Bernard G. Skomal, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

**LG K-30 Cell Phone**
**Model Number: LM-X410 MK**
**IMEI: 355380096442147**
**(Target Device);**

The **Target Device** is currently in the possession of the Department of Homeland Security at 880 Front Street, San Diego, CA 92101.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of February 3, 2019 to May 3, 2019:

a. tending to indicate efforts to import methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Jeffrey Rabine, Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic device, as further described in Attachment A (the "**Target Device**"), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952, 960, and 963, as more particularly described in Attachment B:

   a. LG K-30 Cell Phone
   Model Number: LM-X410 MK
   IMEI: 355380096442147
   (**Target Device**);

This search supports an investigation and prosecution of FRANCISCO SANTANA for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized incident to the arrest of SANTANA on May 2, 2019 at the San Ysidro, California Port of Entry ("POE"), when methamphetamine, cocaine, and heroin were found concealed in the vehicle that he drove into the United States. The **Target Device** is currently in the possession of the Department of Homeland Security in the SAC evidence vault located at 880 Front Street, San Diego, CA 92101.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that a search of the **Target Device** will produce evidence of one or more of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the

1

limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause for the requested warrant.

## EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6. I am a Special Agent and currently employed with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have held my current position with HSI since July 2017. I am a graduate of the Criminal Investigator Training Program, and the Immigration and Customs Enforcement Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC"). During the course of my training at FLETC, I learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and use of electronic evidence, all in relation to violations of the United States Code.

7. I hold a Bachelor's Degree in Criminal Justice from National University. I hold a Master of Public Administration Degree from American Military University. I am a graduate of the United States Border Patrol Training Academy and I was employed as a United States Border Patrol Agent from March 1997 to April 2002. I was employed in the Federal Air Marshal Service from April 2002 to July 2004. I am a graduate of the San Diego Regional Public Safety Training Institute Police Academy and I was employed as a

Police Officer with the San Diego Community College Police Department from July 2002 to July 2017. I have been employed by Homeland Security Investigations as a Criminal Investigator since July 2017. I have attended several advanced training classes including multiple courses on criminal contraband smuggling.

      8.     Currently, I am assigned to a Contraband Smuggling Group in San Ysidro, California. I have personally participated in and conducted investigations of violations of various State and Federal criminal laws, including those related to narcotics violations. I have arrested or participated in the arrest of persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates. I have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks.

      9.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

      a.     Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

      b.     Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

      c.     Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

      d.     Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

      e.     Drug traffickers will use cellular/mobile telephones to notify or warn

3

   their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

 f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

 g. The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

 a. tending to indicate efforts to import methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

 b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States;

 c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, cocaine, heroin, or some

              other federally controlled substances from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, cocaine, heroin, or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device(s)**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

11. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Some of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling in near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. (I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them.) When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

13. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

## FACTS SUPPORTING PROBABLE CAUSE

14. According to a report prepared by CBP Officer Sachs, on May 2, 2019 at approximately 6:50 a.m., SANTANA attempted to enter the United States at the San Ysidro POE as the driver and sole occupant of a white 2008 Toyota Tacoma bearing California license plate #8K84039 (the "Vehicle"). Officer Sachs was working in pre-primary lane 8 and approached the Vehicle, and he asked SANTANA where he was going. SANTANA replied that he was going to Chula Vista to do estimates for his painting business. Officer Sachs asked SANTANA twice if he was bringing anything from Mexico. SANTANA replied, "No." Officer Sachs tapped on the spare tire of the vehicle and found that it felt unusually hard. Officer Sachs did a buster check on the spare tire and it was reading in the high 80's. Officer Sachs then called for assistance and asked SANTANA to put the truck in park and hand him the keys. SANTANA was asked to step out of the Vehicle and was escorted to the Security Office for further processing.

15. According to a report prepared by Canine Enforcement Officer (CEO) Orey, Officer Orey responded with his Narcotics Human Detection Dog, "Biko." CEO Orey had Biko screen the Vehicle, and Biko alerted and indicated to the Vehicle's spare tire. CEO Orey relayed this finding to Officer Sachs.

16. According to a report prepared by CBP Officer Buclatin, the Vehicle was then screened using the Z-Portal, and the operator, CBP Officer Buclatin, discovered anomalies within the spare tire and both the driver and passenger side doors. Officer Buclatin advised the Secondary Lot Supervisor of his findings.

17. According to a report prepared by CBP Officer Crane, Officer Crane was assigned to conduct a further inspection of the vehicle. CBP Officer Crane located 27 packages inside the driver and passenger side doors and spare tire of SANTANA's vehicle, 20 of which contained a substance that tested positive for characteristics of methamphetamine and weighed approximately 9.90 kilograms (21.825) pounds. Six of the remaining packages contained a substance that tested positive for characteristics of cocaine and weighed approximately 7.01 kilograms (15.52 pounds), and one package contained a substance that tested positive for characteristics of heroin and weighed approximately 1.14 kilograms (2.51 pounds). Officer Crane placed SANTANA under arrest at approximately 9:25 a.m.

18. I was notified of the event and responded to the San Ysidro POE. I further seized the Vehicle, the methamphetamine, heroin, and cocaine packages, and the **Target Device**.[1]

19. SANTANA was advised of his Miranda rights. SANTANA waived his rights, and I subsequently conducted a recorded interview of SANTANA.

20. During the post-Miranda interview, SANTANA denied knowledge of the controlled substances in the Vehicle. He stated he has had the Vehicle for the past five years, but has driven it for only the past three years. SANTANA said the seized cell phone (**Target Device**) was his. SANTANA said he has lived in Rosarito, Mexico since approximately mid-February and has been sharing an apartment with his current roommate since then. SANTANA said that the area is not very safe and that cars are often broken into and stolen. SANTANA described his relationship with his roommate as very volatile

---

[1] CBP Officer Crane gave me the Target Device when I responded to the San Ysidro POE as an item seized as part of this case, and, as discussed below, SANTANA identified the Target Device as his.

and abusive, demonstrating that he had bruises from a physical altercation the previous night. SANTANA further stated that he and his roommate are both drug users and that he allows his roommate to use the Vehicle, and that his roommate had taken his Vehicle the previous night from 7:00 p.m. to approximately 3:30 a.m. SANTANA said that he then got into his Vehicle around 5:05 a.m. and drove to the San Ysidro POE, only stopping for gas before arriving at the port. SANTANA further stated that he allows others to drive his Vehicle, including a few friends. He stated that when he got into the Vehicle, he noticed that a plastic part on the driver's side door window was broken, and the rubber seal on the window was broken about three days prior to his arrest. He denied that his roommate would put anything in his car.

21. SANTANA stated that a friend (identified as Mauricio ISLAS) from his rehabilitation center asked him soon after his move to Rosarito if he would be willing to bring money from the United States back to Mexico. SANTANA stated that he agreed to bring money from the United States to Mexico and was paid to do so. In particular, SANTANA stated that he brought money from the United States to Mexico approximately five times, most recently on April 29, 2019. SANTANA said he agreed to be paid $1,000 if he brought $10,000 across. SANTANA explained that while he was in line at the border, he received a call on the **Target Device** from ISLAS asking SANTANA is he was working that day and if he (SANTANA) would bring another money load back south when he came home later that day.

22. During the interview, SANTANA used the **Target Device** to call his roommate.

23. I have reviewed the crossing history in the TECS system for the vehicle SANTANA was driving when he was arrested and determined that he has been crossing the Vehicle regularly into the United States for over a year.

24. Given the facts surrounding SANTANA's arrest, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to

believe that information relevant to the smuggling activities of SANTANA will be found in the **Target Device**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data, is evidence:

    a.    tending to indicate efforts to import methamphetamine, cocaine, heroin, or some other federally controlled substance from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, cocaine, heroin, or some other federally controlled substance from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, cocaine, heroin, or some other federally controlled substance from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine, cocaine, heroin, or some other federally controlled substance from Mexico into the United States;

    e.    tending to identify the movement of proceeds associated with the trafficking of methamphetamine, cocaine, heroin, or some other federally controlled substance that was imported from Mexico into the United States;

    f.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    g.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

25. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of SANTANA, such as telephone

numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**. For the reasons set forth above, I request permission to search the **Target Device** for items listed in Attachment B for the time period from February 3, 2019 up to and including May 3, 2019, which was the day following SANTANA's arrest.

## METHODOLOGY

26. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## CONCLUSION

29. Based on all of the facts and circumstances described above, there is probable cause to conclude that FRANCISCO SANTANA used the **Target Device** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

30. Because the **Target Device** was promptly seized during the investigation of FRANCISCO SANTANA's trafficking activities and has been securely stored since that time, there is probable cause to believe that evidence of illegal activities committed by FRANCISCO SANTANA continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from February 3, 2019 to May 3, 2019.

31.     WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and to seize items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Jeffrey Rabine
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this ___21___ day of August, 2019.

_____
The Honorable Bernard G. Skomal
United States Magistrate Judge

12